## THE STATE OF NEVADA EX REL. H. O. BEATTY, RESPONDENT, v. E. RHODES, APPELLANT.

In the payment of a debt, legal tender notes are in contemplation of law equal to coin; an Act of the Legislature, therefore, making the salary of a State officer payable in legal tender notes after it had previously made it payable in coin, is not rendered unconstitutional by that section of the Constitution which declares that the salaries of certain officers shall not be increased or diminished during the term of office.

This constitutional provision only prohibits the Legislature from increasing or decreasing the number of dollars in lawful money at which the salary of an officer is fixed, at the time of his election.

APPEAL from the District Court of the Second Judicial District, Hon. C. N. HARRIS, Judge of the Third Judicial District, presiding.

The relator's petition for mandamus was as follows:

"H. O. Beatty, of said county, being duly sworn, says that at the general election held in and for the State of Nevada, on the first Tuesday next after the first Monday in November, A.D. 1864, being the eighth day of said month, he was duly elected one of the Justices of the Supreme Court of said State; that afterwards, to wit: on the        day of        in said year, it was duly determined by lot, in accordance with the provisions of the Constitution in relation thereto, that he should fill the term of four years from and including the first Monday in January, A.D. 1865; and that on the        day of        A.D. 1864, he received his certificate of election, and on the fifth day of December, A.D. 1864, he duly qualified by taking the oath of office prescribed by the Constitution of said State, and entered upon the duties of said office.

Said deponent further says that he is still a Justice of said Court, and that his term of office as such Justice will not expire until four years from said first Monday in January, A.D. 1865.

Said deponent further says that, by the Constitution and laws of said State, the salary of the Judges of said Supreme Court was fixed at the sum of seven thousand dollars per annum; and that by the laws of said State and of the Territory of Nevada prior to the existence of said State, all payments into and from the Treasury of said Territory and State were payable only in gold coin until the first day of April, A.D. 1866; and that by the Constitution of said State, it is provided that the salary of Justices of said Supreme Court shall not be diminished during the term for which they shall have been elected.

Said deponent further says, that under and by the provisions of the Constitution of the State of Nevada and of the statutes of said State, it became and was the duty of the Treasurer of said State to set apart, in *gold coin*, on the first day of the present quarter, to wit: on the first day of April, A.D. 1867, or as soon thereafter as there should be in said Treasury such amount of gold coin from the revenue of said quarter, and not otherwise appropriated, the sum of seventeen hundred and fifty dollars, as a portion of the Judicial Salary Fund of said State, for the payment of the salary of this deponent during the present quarter.

This deponent further says that E. Rhodes is now, and for more than two years last past has been Treasurer of said State; that heretofore, to wit: on the          day of June, A.D. 1867, there was and still is in the Treasury of said State, which had come into said Treasury from the revenue of said State this present quarter, the sum of seventeen hundred and fifty dollars in gold coin, which is not otherwise appropriated by law; that on said day of June, A.D. 1867, at Carson City in said State, this deponent demanded of said E. Rhodes, Treasurer as aforesaid, that he would so as aforesaid set apart from such money, so as aforesaid coming into said Treasury from the revenue of said quarter not otherwise appropriated, in gold coin, the sum of seventeen hundred and fifty dollars for payment of the salary of this deponent for said quarter.

With this demand the said Rhodes refused to comply, on the

ground that the law requires him to pay the salary of the Judges of the Supreme Court in legal tender notes ; at the same time admitting that there was gold coin in the Treasury properly applicable to the payment of the Judges' salary, if the law requiring them to be paid in legal tender notes should be held to be unconstitutional.

In consideration of the premises, your petitioner prays this honorable Court for the issuance of a writ of mandamus, ordering and directing the said E. Rhodes, Treasurer as aforesaid, to set apart and appropriate out of the gold coin now in the State Treasury the sum of $1,750, to pay petitioner's salary for the quarter ending on the thirtieth of June, 1867, or to show cause on the — day of ——, 1867, why he has not done so.

And this deponent further prays this Court for such other and further relief as this Court can, in good conscience, and in the administration of equity lawfully grant."

*R. M. Clarke*, Attorney General, for the Appellant, made the following points :

The Constitution of the State of Nevada fixes the salaries of the Judges of the Supreme Court at seven thousand dollars per annum, without specifying the kind of currency in which they are to be paid.   By an Act of the Legislature passed in the year 1864, these salaries were made payable in gold or silver coin.   Afterwards this law was repealed, and the salary made payable in legal tender notes.   This last law, it is claimed by relator, is unconstitutional, and so it was held by the Court below.

The Constitution of the State of Nevada fixing the salaries of the Justices of the Supreme Court does not provide gold coin, but *money generally*.   (Const. Art. XVII, Sec. 5.)

It was clearly the intention of the Constitution to provide *currency* or legal tender notes of the United States.   (Debates, 156, 157, 282, 288, 304, 600, 616.)

Having provided *coin* for the official reporter, in the Constitution, it is evident the difference between the currencies was brought to the attention of the Convention ; and furthermore, that in all other cases *currency* was to be the rule.   *Provisio unias, etc.*   (Art. XVII, Sec. 26, Debates 751.)

The Constitution providing " *money,*" the presumption is that payment in currency was intended. ( *Cox* v. *Smith*, 1 Nev. 170.)

The Act of January 17th, 1867, requiring the Judge's salary to be paid in gold coin is unconstitutional.

1st. Because in derogation of the letter and spirit of the Constitution of this State. (Art. XVII, Sec. 5; Art. VI, Sec. 15, Debates 729.)

It increases the salary as fixed by the Constitution, upon the theory of the petitioner.

The Legislature had no right to do more than appropriate money. (Art. VI, Sec. 15.)

Because in derogation of the laws of the United States. ( *Milliken* v. *Sloat*, 1 Nev. 582, 583, 596.)

This Court cannot enter upon an inquiry touching the difference in the value of the currencies, and as they are equivalent in law and as the Treasurer had before action set apart currency, petitioner was not damaged and is estopped. ( *Milliken* v. *Sloat*, 1 Nevada, 583.)

The Act of 1865 (Statutes 64–5, p. 98) is no part of the contract between the State and the petitioner, and may therefore be modified or repealed at any time. (4 Little, 46 ; 13 B. Monroe, 385 ; 18 Maine, 112; 3 Denio, 276, 277 ; 15 Cal. 429, 454.) The Legislature has repealed it. (Laws 1866, 135, 190 ; Id. 74.)

The change from one lawful money to another, and especially as to salaries, cannot be held to impair the obligation of a contract. (7 Ind. 158; 27 N. Y. 454, 455, 456; 26 Miss. 15 U. S. Dig. 108.)

If the Acts of 1866 reduce the salary, does not the Act of 1865 increase it? Do not the Acts of 1866 simply restore the Judges' salary to the basis originally fixed by the Constitution? (Act 1866, pp. 74, 135, 190.)

*George A. Nourse*, for the Relator.

The term of Relator is admitted to have commenced on his taking the oath of office, December 5th, 1864, and to extend to first Monday in January, 1869.

The Constitution of this State fixed the salary of the Justices of

the Supreme Court of said State for their first term, at seven thousand dollars per annum, but did not specify in what kind of currency it should be paid—whether coin dollars or paper dollars. (Article XVII, Sec. 5, State Constitution.)

At that time two kinds of money or currency existed, and still exist—each made by the laws of the United States a legal tender in payment of debt, dollar for dollar; but *really* of unequal value. Were it not so, no law would be needed in making United States Treasury Notes a legal tender, for a debtor would as lief pay coin ·as paper, if there were no difference in their *real* value. ( *Cox* v. *Smith*, 1 Nev. 169–70 ; *Milliken* v. *Sloat*, Id. 583.)

It was competent for the Legislature to make this salary payable in either paper or coin originally. They were only required· to " set apart from each year's revenue a sufficient amount of *money* to pay such compensation." Setting apart either coin or paper money would have complied with this requirement. (Art. VI, Sec. 15, State Constitution.)

The first Legislature of the State, by providing for the setting apart of *coin* as a fund from which alone the salary of the Justices of the Supreme Court could be paid, made that certain which by the Constitution had been left uncertain. Thenceforth the salary of the Justices of the Supreme Court was 7,000 *coin* dollars. (Laws of 1864–5, 97–8.)

The Constitution provides that the salary of said Justices " shall not be increased or diminishêd during their continuance in office"; and again, while authorizing the Legislature to increase or diminish the salaries fixed in the Constitution, it expressly provides that " no such change of salary or compensation shall apply to any officer during the term for which he may have been elected." (Art. VI, Sec. 15, State Constitution ; Art. XV, Sec. 9, Id.)

The Legislature of the State subsequently passed bills providing for· the payment of salaries, etc., " in any currency made by the laws of the United States a legal tender," and requiring the Treasurer to convert into greenbacks all the coin in the State Treasury not needed to pay bonds or interest. (Pages 135, 190, Laws of 1866.)

But these laws, if construed to direct and compel the Treasurer

to pay the salary of the then incumbents of Judicial and State officers in greenbacks during their then existing term, were unconstitutional and void; for it cannot be questioned that a salary is "diminished" by keeping it at the same number of dollars, but making it payable in dollars severally of less value than the kind of dollars in which it was originally payable, just as truly as if it was changed to a less number of dollars, each dollar remaining of the same value as before.

So then, these being laws (if construed to make it the Treasurer's duty to pay these salaries in greenbacks) for the diminishing the salaries fixed by the Constitution, are, under Sec. 15 of Art. VI of State Constitution, void as to those then in office during their then existing terms of office; or to state it more clearly, are to be construed under Sec. 9 of Art. XV, as if the *proviso* of that section were annexed to said laws, to wit: "*Provided*, that no such change of salary or compensation shall apply to any officer during the term for which he may have been elected."

These laws, then, being of no effect as to the relator during his present term of office, are to be treated for the purposes of this action as if they had no existence. The defendant's duty, then, is only to be gathered from the original statute as to payment of salaries of Justices of the Supreme Court, hereinbefore cited, to wit: Laws of 1864–5, pp. 97–98.

*H. O. Beatty*, for himself.

The first proposition I lay down is this : The salary of the Judges is fixed in the schedule of the Constitution, for the first Term, at $7,000 per annum.

At that time there were two unequal currencies; one of only about half the value of the other. (See *Cox* v. *Smith*, 1 Nev. 169–70.)

The Constitution as it came from the hands of the convention did not determine the kind of currency in which this $7,000 was to be paid. It was left an open and unsettled question, to be determined by the first Legislature how these payments should be made. Sec. 15 of Art. VI requires legislative action on the subject. It requires the Legislature to provide for regular quarterly payments.

Will it be contended that when the Legislature was called on to pass an Act for the regular quarterly payment of salaries, it was inhibited from saying in what currency they should be paid ? That the kind of currency was to be left to the discretion of the Treasurer, allowing him to pay one Judge, if he saw fit, in gold, and another in currency ? If this absurdity is not contended for, then it must be admitted the first law passed by the Legislature making the salaries payable in gold coin, was a valid act. If it was a valid act, then salaries of the Judges elected for the first Term became fixed at $7,000 in gold coin.

If they did become so fixed, then the Legislature might at any time repeal or alter the law so fixing the salary or compensation; but by the provisions of Sec. 9, Art. XV, the law would not take effect so as to change or alter the salary of those then in office, but would only affect those thereafter to be appointed or elected.

If the foregoing propositions be true, the salary of petitioner is fixed at the rate of $7,000 per annum in *gold coin* for the remainder of his term.

Then there remains one other point to discuss. It may be contended that although the salaries of the Judges are fixed by the Constitution and laws of the State at $7,000 in *gold coin*, yet the State, like an individual, may disregard this provision of her own contract, and pay in anything which the law of the United States declares a legal tender for debt. I shall not dispute that proposition. The State may disregard her obligation to pay in *gold.* She may go further : she may refuse to pay in anything. There can be no doubt if a constitutional convention was called to amend the Constitution, that convention in a new or amended Constitution might provide that the present Judges should remain in office at a salary of $7,000 in greenbacks. It might also provide that any arrearages of salaries should be paid in greenbacks. Nay, it might provide that all arrearages of salary should be forfeited to the State, or never paid to those entitled, which would be an indirect forfeiture. And if such a Constitution were ratified by the people, that would be the end of the matter; for it is certain no suit can be maintained against a State.

But whilst the people in their sovereign capacity could do such high-handed things, the Legislature can do nothing in opposition to

the Constitution under which they are elected. They are the agents of the people, with powers strictly limited.

Let us illustrate this by a case of private agency. A owes B $1,000, which he has promised to pay in gold. A takes $1,000 in gold out of his safe, and delivers it to his servant or agent to carry it to B and pay his debt of $1,000 then due. On the road the servant changes the $1,000 in gold into $2,000 in legal tender notes, and tenders B $1,000 in payment of his debt. This would not be a good tender, for it would not be a tender by A, but the unauthorized act of A's servant. In such case, if B should take the $1,000 in greenbacks in ignorance of A's having sent the gold, there can be no doubt but an action would lie against the servant for the $1,000 in currency had and received.

Whether it would be at the suit of A or B might be doubtful; but certainly one or the other could recover.

So, too, in the case of Nevada State bonds, the Legislature has set apart gold coin to pay the annual interest thereon.

Under the decision in *Milliken* v. *Sloat,* no doubt the *State* might, if it chose to violate its plighted faith, pay the interest in greenbacks. But no one will contend the Treasurer can do so.

That case simply decided that the debtor (not the debtor's servant) might elect to pay either in gold or legal tenders. That such election remained with him up to the time the debt was finally discharged, and no Court could control it; and the debtor could not deprive himself of that right of election by any contract he might enter into. But the Treasurer is not the *State ;* he is not the *debtor ;* he has not the election.

In the case of State bonds, the *State elects,* through its Legislature, to pay in gold. This the Legislature has a right to do because its powers are general, and there is no constitutional restriction in this respect.

In the case of salaries, the election is made partly by law of the Legislature, and partly by the Constitution. Let it be considered that when the laws were passed providing for a change in the manner of payment, the ninth Section of Art. XV provides that such laws shall not affect present incumbents; and it is clear enough what is the duty of the Treasurer. Had this *proviso* been contained in

the law, the Treasurer would never have hesitated about setting apart petitioner's salary in gold. But the law is found on one page of the Statutes, the constitutional proviso on another, and the Treasurer has failed to connect them.

The petitioner merely seeks to compel the Treasurer to perform his official duty as prescribed by the Constitution and legislative enactments, the Constitution of course prevailing where there is any conflict.

Opinion by LEWIS, J., JOHNSON, J., concurring.

Upon the first argument of this case I confess I was fully of the opinion that the writ ought to issue, but after further and more mature consideration, I am satisfied my first conclusion was incorrect. Nor do I hesitate to say that I entered upon the examination of the case with a desire to grant the peremptory writ, if it could be done upon correct legal principles; because we all know it was the general understanding, not only among the first State officers, but among the people at large, that the salaries of such officers would be payable in gold and silver coin; and I deeply regret that the law will not afford the learned relator the relief to which in my judgment he is justly entitled. But the members of the profession well know that the law, though embodying the wisdom of centuries, though adorned by the learning and improved by the genius of profound jurists and great statesmen, has not yet attained to such perfection as to afford a remedy where justice gives a right. As in this case, whilst I believe the relator is justly entitled to the relief which he asks, yet I do not think the law warrants the issuance of the peremptory writ, and in this the law fails to meet the requirements of justice. But the reasons which have led me to my present conclusion appear to me so perfectly conclusive, that I could not consent to an affirmance of the judgment below without a consciousness that I had disregarded the letter of the law.

Before proceeding to the discussion of the questions upon which counsel for relator and myself differ, and that the real ground of difference may be better understood, I will mention the points in this case upon which we seem fully to agree: and first, I admit that gold coin and legal tender notes are in legal contemplation

Beatty *v.* Rhodes.

equivalent, only for one purpose, namely: for the payment of debts public and private: that in the market there is an actual difference between these two currencies; second, that this is in no sense a proceeding to recover a debt; third, that it was the object of the framers of the Constitution so to regulate and fix the salaries of the Judges of the State as to place it out of the power of the legislative department to increase or diminish such compensation during the time for which they may be elected.   I admit, if there be a present existing law of the Legislature making the relator's salary payable in gold coin, and directing the Treasurer of State to set apart that kind of currency for its payment, that this writ ought to issue, and that in such case the setting apart by the Treasurer of legal tender notes would be no answer or defense to this proceeding.   But in my opinion there is no such law, and here is the point upon which we differ.   It is claimed on behalf of the relator, that his salary was fixed in the Constitution at $7,000 per annum; that, as there were at the time of the adoption of that instrument two kinds of lawful money current in this country, one being more valuable than the other, it became the duty of the Legislature at its first session, to specify the kind of money in which such salary should be paid; and having done so by making it payable in gold coin, which was the most valuable currency, that the Legislature could not during his term of office repeal that law or make his salary payable in the less valuable currency, because it is said such change would result in diminishing his compensation, which it is conceded cannot be done.   I admit that if the change from one currency to another " diminished " the salary, in the sense in which that word is used in the Constitution, the Legislature had no right to make such change, and any law passed by it for that purpose would be unconstitutional and void.   But in my opinion it was not the intention of the framers of the Constitution to place any restriction upon the will of the Legislature as to the kind of lawful money in which it should cause the salaries of the various officers to be paid, or to prohibit it from changing after it had once fixed the kind.   The provision inhibiting the increase or diminution of an officer's compensation during his term of office, can mean nothing more than that the number of dollars in lawful money of the United States

shall not be increased or diminished during such term. And it being conceded that the relator's salary is a debt, the law which changed the kind of dollars in which it should be paid is not repugnant to the Constitution, provided the same number of dollars in lawful money is maintained, as in such case it cannot be said that the salary is legally reduced, though in fact it may be. If my construction of the constitutional provision above referred to be correct, the correctness of the result to which I have arrived can hardly be questioned. That such is the proper construction I will hereafter endeavor to show.

It may be assumed, for the purposes of this case, that the Legislative power of a State is unlimited, except as it may be restricted by the Constitution and laws of the United States, and the Constitution of the particular State. It has not the power to enact any law conflicting with the Federal Constitution, the laws of Congress, or the Constitution of its particular State. With these restrictions, the Legislature of any State is perhaps as omnipotent in its legislative power as the British Parliament itself. It is conceded on all sides that the law by which the relator's compensation was made payable in treasury notes instead of gold coin, and which repealed the law making it payable in coin, is not in conflict with any provision of the Federal Constitution, with any Act of Congress, or with the Constitution of this State, unless it diminished the relator's salary, in which case it would of course be unconstitutional. The provision with which it is claimed this law conflicts reads as follows: " The Justices of the Supreme Court and District Judges shall each receive quarterly for their services a compensation to be fixed by law, and which shall not be increased or diminished during the term for which they shall have been elected, unless in case a vacancy occurs, in which case the successor of the former incumbent shall receive only such salary as may be provided by law at the time of his election or appointment." (*Vide* Constitution, Art. VI, Sec. 15.) Does this section so restrain the power of the Legislature that it cannot constitutionally make the relator's salary payable in legal tender notes, after having first made it payable in gold coin? In my judgment it does not. Whilst it is perfectly apparent that this section of the Constitution prohibits the Legislature from

reducing the number of dollars of lawful money to be paid during the term of an incumbent, I cannot believe it was intended that the actual or market value of the dollar itself was to be taken into consideration in determining whether such salary was increased or diminished.

It was known to the members of the Convention who framed the Constitution of this State, that the power of coining money and of declaring what should and should not be lawful money in the United States rested entirely with the Federal Congress. It was well known that the gold and silver dollar could at any time be debased, so that whilst its intrinsic value might be greatly diminished its nominal value would be the same. This is a power which Congress not only possesses, but which it has often exercised, and that power is, I apprehend, unlimited.

Can it be believed that the Constitution of this State has so trammeled the Legislature that it cannot make its entire revenue payable in the debased currency? If it can do that, it would seem that it could, without violating the constitutional provisions above referred to, pay its officers in such debased coin at its nominal value. Again: although the members of the Constitutional Convention knew that the lawful money of the United States might at any time be debased, so that its intrinsic or actual value might be reduced to an unlimited extent, whilst its nominal value remained the same, yet they in express terms deprived the Legislature of the power of increasing the number of dollars, so as to make up the decrease in the real value of the dollar itself. If it were the intention to maintain the salary or compensation of officers at the same actual value during their entire term, the Legislature would not surely have been deprived of the power of nominally increasing such salary, (as it certainly is) whilst it was known that it might, at any session of Congress, be decreased in fact by a debasement of the coin. Being fully aware of the possibility of such action on the part of the Federal Congress, is it not fair to presume that the power to increase the nominal amount of the salary, so that it should not in fact be decreased by any such Act of Congress, would have been left with the Legislature?

If this constitutional inhibition makes it incumbent on the State

to pay its officers in currency of the same intrinsic or actual value during the entire term for which they may be elected, then it is evident that the Legislature might be compelled to collect the revenue of the State in dollars of the coinage of a particular year, those of a previous or subsequent year being perhaps of greater or less real value, or to send its Treasurer into the market to purchase a sufficient number of dollars of that special year's coinage for the payment of its officers. It will hardly be contended that any such thing has ever been contemplated.

The same construction must be placed upon the Constitution of the State as is generally placed upon like language in other Constitutions. The Constitution of the United States declares that Justices of the Supreme Court " shall at stated times receive for their services a compensation which shall not be diminished during their continuance in office." (Art. III, Sec. 1.) In the year 1834, the gold coin of the United States was so debased that an eagle coined prior to that year was worth sixty-six cents more than the eagle coined after. Can it be claimed that the Judges in office at the time of such debasement could insist upon being paid in the money coined prior to the year 1834, or upon a sufficient increase in the number of dollars to make up the decrease in the real value of the dollar itself? That, I believe, was never claimed. If it be correct that the Constitution does not restrict or attempt to control the Legislature as to the kind of lawful money in which it shall pay the salaries of its officers, but only as to the number of such dollars, it follows, as an unavoidable conclusion, that a law simply changing the kind of money in which a salary is made payable, but maintaining the same number of dollars in lawful money, could not be said to conflict with the constitutional provision under consideration.

But if this conclusion be incorrect, there is another answer to relator's position, which seems to me entirely conclusive. The Act of Congress making treasury notes lawful money and a legal tender for all debts, public and private, was the supreme law of the land at the time of the adoption of the Constitution of the State, and is above and must control that Constitution itself. Thus gold, and silver, and treasury notes to a limited extent, are made lawful money and a legal tender for all debts. So far as legislation of Congress can make gold and

treasury notes equivalent for the payment of debts, it has been done. For that purpose the currencies are absolutely equivalent, dollar for dollar; and if there be any difference, it is the result of higher laws and causes, which Congress cannot control. No legislative Act could make them more perfectly equal than they are now. The value of all currency, as compared with other things, may be controlled by the demand and supply, as the value of anything else may be. That value no legislation can well control and govern. But by the sovereign power vested in it, Congress may make a paper dollar equivalent to a gold dollar for the payment of all debts. This it has done. The law being supreme, it is made the duty of all the Courts of the country to treat treasury notes as the exact equivalent of gold for the purposes mentioned in the Act of Congress. They have not the power to look upon that Act to ascertain the real or market value of either of the currencies. The law says that a piece of paper issued by the Government is a dollar, and lawful money for the payment of debts; it says nothing more with respect to the gold which is coined for the same purpose. When treasury notes are offered in payment for a debt, the Courts have no more right to inquire as to their market value, and pronounce them of that value only, than they have to calculate the value of gold coin by the quantity of pure metal which it may contain. The Act of Congress alone determines the value of the paper dollar and the gold, when it is sought to use them for the payment of a debt, public or private. It is admitted that the relator's salary, which was fixed in the Constitution at seven thousand dollars, and which was by the Legislature afterwards made payable in gold coin, is a debt. Upon this there is no controversy. Now then, did the Act of the Legislature, making the salaries of the Justices of the Supreme Court payable in treasury notes, and repealing the former Act which made them payable in gold coin, diminish those salaries so as to make the Act repugnant to the Constitution? Certainly not. Because the salary being a debt, and legal tender notes being equivalent to gold for the payment of it, there is no such diminution as the Courts can recognize.

As the Act, which it is said is unconstitutional, did not reduce the number of dollars fixed in the Constitution and the first Act of

the Legislature, but only provided for the payment of the salaries in a currency which, though different in kind, is nevertheless equivalent to gold for the payment of such salaries, the relator's compensation is not, in legal contemplation, reduced. Unless it can be said that treasury notes are not equivalent or equal to gold for the payment of a debt, I am unable to see how the Act in question can be declared unconstitutional.

True, this is not a proceeding for the recovery of a debt; but before the Act of the Legislature can be declared objectionable as diminishing relator's salary, it becomes necessary to ascertain whether it is diminished—whether the Legislature, in repealing the Act by which his salary was made payable in gold, provided a substitute for the gold coin, which is legally equal to it.

Concluding as I have that it did provide such an equivalent, it follows that the law is not repugnant to the Constitution.

Judgment reversed.